**JAMES R. FROCCARO, JR.**
**Attorney at Law**
**20 Vanderventer Avenue, Suite 103W**
**Port Washington, NY 11050**
**telephone: (516) 944-5062**
**fax: (516) 944-5066**
**email: JRFESQ61@aol.com**

January 5, 2023

BY ECF
Hon. Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 10017

Re:  United States v. Norman Dupont
95 Cr 91 (RJD)

Dear Judge Dearie:

I am counsel to defendant Norman DuPont.  This letter is written in support of Mr. DuPont's motion for a sentence reduction.  For the reasons set forth below, I am most respectfully asking Your Honor to modify Mr. DuPont's sentence to time-served to permit his immediate release to his family.

The Procedural History

I know that Your Honor is familiar with the underlying facts and procedural history of Mr. DuPont's case - so I'll be brief.  On October 10, 1995, Mr. DuPont was found guilty after a jury trial before this

1

Court of the 1990 murder of Harmon Fuchs,[1] along with extortion and related firearm charges. He was ultimately sentenced by Your Honor to life imprisonment, plus five years. A copy of the **Amended Judgment In A Criminal Case** is attached as Exhibit A.

All of the parties involved in Mr. DuPont's sentencing in 1996 apparently believed that his conviction on Count Two - charging him with an 18 USC 1959(a)(1) violation - carried a mandatory minimum sentence of life.[2] The change in the punishment for a conviction under this statute from "imprisonment for any term of years or for life" to "death or life imprisonment," did not occur, however, until an amendment in 1994 - years after this charged crime was committed. This presented an *ex post facto* issue which should have precluded the imposition of at least a statutory mandatory minimum life sentence. The sentencing was in the pre-Booker era as well, however, when the Guidelines were considered mandatory and Mr. DuPont's Guidelines imprisonment range was, in any event, life.

Mr. DuPont has been imprisoned for nearly three decades - since the date of his arrest on April 13, 1995. He is presently 74 years old. The near 29 years he has already served in prison is the functional equivalent - with credit for good time - of a 35 year term of incarceration.

_____

[1] Harmon Fuchs was a dispatcher at the M-Tac Car and Limo Service in New York City. He was an innocent victim shot by Mr. DuPont to send a message to the owner of the Limo Service who owed a loansharking debt to Mr. DuPont.

[2] The only count in the Indictment that Mr. DuPont was convicted of that carried a maximum term of life imprisonment was Count Two.

I am moving on behalf of Mr. DuPont for a sentence reduction pursuant to 18 U.S.C. 3582(c)(1)(A)(i). Under this statute, once a defendant has exhausted his or her administrative remedies, a court may reduce the defendant's sentence so long as the reduction is warranted by extraordinary and compelling reason(s), and is appropriate in light of the Section 3553(a) factors.[3]

Mr. DuPont previously filed a pro se motion for a sentence reduction on April 10, 2020 - without any exhibits nor supporting documentation - arguing principally that he should be released because he suffers from underlying medical conditions which made him especially vulnerable to the Coronavirus while in prison. On May 4, 2020, Mr. DuPont's pro se motion was denied by Your Honor because he provided no evidence that he had exhausted his administrative remedies. The Court also found that Mr. DuPont's age, physical condition and the general challenges confronting penal institutions did not, in any event, constitute extraordinary and compelling reasons justifying his release at the time. A motion to reconsider Mr. DuPont's pro se submission was then filed which was also denied by Your Honor.

On June 15, 2022, a one-page letter written by Mr. DuPont seeking a "second chance" and his release from prison was filed with the Court. Your Honor construed the letter as a pro se motion for a sentence reduction and provided the following directive to

_____

[3] A defendant seeking a sentence reduction under Section 3582(c)(1)(A) is supposed to first apply to the Bureau of Prisons to bring a motion on the defendant's behalf. If the Bureau of Prisons denies that request - or fails to act upon it within 30 days - a defendant may then seek judicial intervention to modify a sentence.

Mr. DuPont.  As this Court explained in the applicable Order:

>The Court is in receipt of Mr. DuPont's letter, ECF 122,
>requesting a second chance and seeking a reduction of
>the life sentence he has been serving since 1996.  The
>Court construes Mr. DuPont's letter to be a motion under
>18 U.S.C. 3582(c)(1)(A) for a reduction in sentence.
>Mr. DuPont appears to have made positive strides while
>incarcerated:  a BOP employee describes him as a "model
>inmate" who exhibits "exemplary behavior."  ECF 122 at 2.
>His disciplinary history reflects only two infractions
>in 1995 and 1997.  See ECF 123 at 2.  However, Mr. DuPont's
>motion is both procedurally and substantively deficient;
>he has failed to exhaust administrative remedies, adduce
>sufficient evidence of extraordinary reasons supporting a
>reduction in sentence, or address the 18 USC 3553
>sentencing factors.  All are required before a court may
>reduce a sentence under 18 U.S.C. 3582(c)(1)(A).
>Mr. DuPont should follow the administrative procedures
>outlined in 18 U.S.C. 3582(c)(1)(A) and provide support in
>any future submissions for the position that extraordinary
>and compelling reasons, as well as the 3553 factors warrant
>a reduction in his sentence.

See ECF Doc 124.

Heeding Your Honor's directive, Mr. DuPont then moved to dismiss his one-page pro se sentence reduction motion.  His motion was granted by Your Honor without prejudice to refiling after the exhaustion of his administrative remedies.[4]

---

[4] This past May, I was hired by Mr. DuPont's loved ones to prepare and file a counseled brief addressing the specific issues raised by Your Honor in this Order.

On May 21, 2023, the Warden at FCI Fort Dix where Mr. DuPont is imprisoned was served with a request for his release.  A copy of Mr. DuPont's administrative request is attached as Exhibit B.  More than 30 days passed - with no response from the Warden - giving rise to the instant motion.[5]

The Basis for the Instant Motion

## A.  The Extraordinary and Compelling Reasons

In United States v. Brooker, 976 F.3d 228, 237-238 (2020), the Second Circuit held that "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release."  And, that "[t]he only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation..alone shall not be considered an extraordinary and compelling reason.'"  Id.  Indeed, the determination as to what "constitutes extraordinary and compelling reasons warranting a reduction is committed to the sound discretion of the district court."  See United States v. Roney, 833 Fed. App'x 850, 852 (2d Cir. 2020) (summary order).

Furthermore, in United States v. Concepcion, 142 S.Ct. 2389 (2022), the Supreme Court recently held that the First Step Act allows district courts to consider intervening changes of law or fact in exercising their discretion to reduce a sentence - such as consideration of a defendant's present-day characteristics and post-

_____

[5]  In fact, the Warden has never responded to Mr. DuPont's administrative request.

sentencing history under 3553(a).  As the Supreme Court explained:

> Federal courts historically have exercised broad discretion
> to consider all relevant information at an initial sentencing
> hearing, consistent with their responsibility to sentence the
> whole person before them.  That discretion also carries
> forward to later proceedings that may modify an original
> sentence.

Id. at 2393.

The most recent amendments to the United States Sentencing
Guidelines which took effect on November 1, 2023, now reflect the
broad approach announced by the Second Circuit in Brooker in the
wake of the First Step Act.  The amendments expand the list of
specified extraordinary and compelling reasons and retain the
"other reasons" catchall basis for a sentence reduction to better
account for and reflect the plain language of section 3582(c)(1)(A),
the legislative history, and decisions by the courts in the absence of
a binding policy statement.

The Guidelines, themselves, now also provide that the
*rehabilitation of a defendant while incarcerated may be considered
in combination with other circumstances* in determining whether
extraordinary and compelling reasons warrant a sentence reduction.
See 1B1.13(d).

As set forth below, Mr. DuPont, now age 74, has made extraordinary efforts to rehabilitate himself while imprisoned for the past near 30 years.  Mr. DuPont has - by all accounts - been a model and exemplary inmate throughout the nearly three decades that he has been incarcerated.  Attached hereto as Exhibit C is a **Positive Decision Report** regarding Mr. DuPont's behavior while imprisoned.  The Report provides in pertinent part as follows:

> It is the opinion of Inmate DuPont's Unit Team that his institutional adjustment can be deemed as outstanding by his demeanor and character.  It may be cliche to state, but inmate DuPont is an all-around model inmate who has continued to show exemplary behavior while housed at FCI Fort Dix.

<u>See</u> Exhibit C at **"Justification (Description of Positive Behavior)."**

Significantly, Mr. DuPont has not received a single disciplinary infraction while imprisoned for over a quarter-of-a-century.  In an effort to further improve and rehabilitate himself, Mr. DuPont has also successfully completed over 40 educational and vocational courses - in addition to obtaining his GED or High School equivalency diploma while imprisoned.  This information is all confirmed in the **Summary Reentry Plan - Progress Report** for Mr. DuPont attached as Exhibit D, at **"Discipline Reports," "Current Education Information,"** and **"Education Courses,"** respectively.

The **Summary Reentry Plan - Progress Report** is an unbiased testament to Mr. DuPont's extraordinary rehabilitative efforts and the change that he has undergone over the course of the past near 30 years. Significantly, in the **"General Comment"** portion of this Report, the consensus among his Unit Team was as follows:

> Unit Team has had the opportunity to see the impact inmate DuPont has had on some of the inmates he interacts with. Due to him having a Life Sentence, many inmates as well as staff are amazed at how he has a positive attitude and enjoys life everyday. Unit Team feels if he is given the opportunity to be released, he will be a productive citizen and will live the rest of his life as a model citizen.

Attached as Exhibit E, is a letter from Senior Correctional Law Enforcement Officer Specialist R. Wilson. This letter also describes the present - 74 year old - version of Mr. DuPont in exemplary terms as a "model inmate to the inmate community" who, among many noteworthy accomplishments, "follows the rules, policies and guidelines without deviating," "deters negative behavior," and "has been incident free for over 25 years." Moreover, in describing Mr. DuPont's work performance, Senior Officer Specialist Wilson explained that:

> I....have observed, witnessed, and overseen inmate Norman DuPont, while performing and assuming duties of 5841 Housing Unit Officer. Inmate Norman DuPont has conducted himself with integrity, professionalism, and proficiency. He has a very good work ethic. As a housing unit orderly, and a former laundry orderly, inmate Norman DuPont has fulfilled his tasks and completed his assignments. His performance level has been excellent....

Mr. Dupont's outstanding work performance record while in prison is also confirmed in the **Summary Reentry Plan - Progress Report** for Mr. Dupont as follows:

> Inmate Dupont is assigned as an Orderly and Mentor in the building.  His work reports indicate he needs no supervision and takes the lead role on projects in the Unit.  He is considered to be well respected in the Unit and always willing to take on additional duties in order to get the job completed."

See Exhibit D at **"Work Assignment Summary."**

Mr. DuPont was even recruited by the staff at FCI Fort Dix to be a mentor to new inmates.  Notably, in his role as a inmate mentor, Mr. DuPont has earned the trust and respect of both Bureau of Prisons staff and inmates alike.  As his Unit Team explained in the attached **"Program Plans"** portion of the **Summary Reentry Plan - Progress Report** for Mr. DuPont:

> Since inmate DuPont's arrival at Fort Dix he has not been considered to be a management concern.  Unit Team recruited inmate DuPont to be an inmate mentor to the new inmates who arrive in the Unit.  Inmate DuPont is housed in the Unicor/Admission and Orientation Team.  Due to inmate DuPont's clear conduct and mentorship he provides to newly assigned inmates, he has earned the respect of the inmates.  He currently has a Life Sentence and is one of the few inmates who are currently housed in this unit who have that sentence.

See Exhibit D.

Finally, the First Step Act required the Attorney General to develop a risk assessment system to be used by the Bureau of Prisons to assess the recidivism risk of all federal prisoners. Attached hereto as Exhibit F is the **FSA Recidivism Risk Assessment** for Mr. DuPont.  Significantly, the Bureau of Prisons has assessed Mr. DuPont's risk of recidivism if released as "MIN" or minimal.

Unfortunately, the Coronavirus ultimately spread like wildfire throughout FCI Fort Dix where Mr. DuPont has been housed for years.[6]  At various points during the years long pandemic, FCI Fort Dix had the highest number of Coronavirus cases of any prison facility in the entire country.  I have attached hereto collectively as Exhibit G, the following news articles on the Coronavirus outbreak at FCI Fort Dix entitled: (1) **"Absolute chaos and terrifying.  The Coronavirus is running rampant through N.J. Prison again"**; (2) **"'Clear and present danger':  U.S. Rep. Kim calls for FCI Fort Dix lockdown as cases top 800"**; (3) **"Fort Dix, With Most Cases Among Prisons, Sees 1st Death"**; and (4) **"2nd inmate at FCI Fort Dix dies from COVID-19 complications."**

As the Coronavirus tore through the FCI Fort Dix facility, very onerous - near 24/7 lock-downs and restrictions were imposed - that made Mr. DuPont's incarceration far harsher and more punitive than normal.[7]  Indeed, the Unit where Mr. Dupont has been imprisoned since he arrived at FCI Fort Dix in 2019 was on lockdown status due

---

[6] Mr. Dupont is in the high risk category for getting very sick, or worse, if infected with COVID-19, by virtue of his age, alone.  Mr. DuPont was infected with the virus in late 2020, and ultimately recovered.  But, he still suffers from the long term effects and has difficulty breathing to this day.

[7] As set forth in more detail, infra, numerous courts have found this circumstance - in combination with rehabilitation - sufficient to warrant a sentence reduction.

to the Coronavirus - thru at least May of 2023.  <u>See</u> **Summary Reentry Plan - Progress Report** attached hereto as Exhibit D at **"Education Information Summary"** ("Since his [Mr. DuPont's] arrival at the facility, the Unit has been on a locked down status due to COVID.")[8]

As recounted in the letters from family members attached hereto collectively as Exhibit H, the resulting COVID-19 restrictions at FCI Fort Dix also prevented Mr. DuPont from having visits with loved ones for years on end.[9]  As his son, Ralph, wrote in his letter to Your Honor:

> My wife and I have 2 sons, ages 9 and 10 and we just welcomed a new baby girl.  My father has barely seen my children in person, and he has not seen them at all for years, including our newborn with all the COVID restrictions.  The last time we had a family visit with my father due to the COVID outbreaks where he is housed is a number of years ago.  During the pandemic, we would get to speak with him, if at all, for a few minutes each month.  This was obviously extraordinarily difficult for us all, but especially him - since we [his family] are his only contact with the outside world.

---

[8] The Unit Team went on in this portion of the Mr. Dupont's **Summary Reentry Plan - Progress Report** to further praise him during the prison's onerous and years long locked down - for "tak[ing] it upon himself to assist with helping other inmates who have issues obtaining their GED and has assisted the newly arrived inmates with what classes they should take in order to assist them with their Re-Entry needs."  <u>Id</u>.

[9] For ease of reference, I have placed the letters from Mr. DuPont's family in alphabetical order.

As Mr. DuPont's daughter-in-law, Nicole, explained in her letter to the Court:

> When I first met my father-in-law, he was housed in West Virginia.  It was an 8 ½  hour drive for us to visit with him - but we've made the trip - wherever he was and no matter how long - because it meant so much for him to see us all.  The recent COVID-19 pandemic has been absolute torture for us all, but especially for my father-in-law, because the restrictions put in place at Fort Dix prevented us from seeing him at all for years.

As his wife, Maria, stated in her letter to Your Honor:

> Norman and I have always maintained our relationship over the many years that he has been in prison - and I have never given up on him.  We talk over the phone several times a week, and I have always tried to visit him whenever possible. The COVID-19 pandemic kept us apart for years with the restrictions that were put in place.  It was very painful for me and my daughter not being able to see him - and for him as well.  His family is all that he has after all of these years....

Finally, as set forth in more detail, infra, another circumstance that the courts have found sufficient - in combination with rehabilitation - to warrant a sentence reduction - involves defendants who have been the subject of mandatory minimum or pre-Booker mandatory Guidelines life sentences.  Mr. DuPont was subjected to both here.  Though the mandatory minimum life sentence may have been imposed in error - the Guidelines were nonetheless mandatory at the time and prescribed an imprisonment range of life.  Regardless, the courts are authorized to reduce a

12

statutory mandatory minimum sentence or a pre-<u>Booker</u> sentence now under 3582(c)(1)(A).[10] Mr. DuPont has, in essence, already served a full 35 year term of incarceration. As set forth in more detail below, the average federal sentence imposed last year nationwide for the crime of murder was 21.5 years, and in the Second Circuit, the average was less than 19 years.

In sum, these circumstances, in combination, clearly support Mr. DuPont's sentence reduction request here. See <u>e.g.</u>, Section 1B1.13(d) of the Guidelines ("...rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted).

## The 3553(a) Considerations

According to U.S. Sentencing Commission, during the year 2022, the national average federal sentence imposed for the crime of murder was approximately 21.5 years. Moreover, the average sentence imposed for the crime of murder in the Second Circuit was less than 19 years. <u>See</u> https:/www.ussc.gov/sites/default /files/ pdf/research-and- publications/federal-sentencing-statistics/state-district-circuit/ 2022/2c22.pdf - at 11. Mr. DuPont, who is approaching his 75th birthday - has already been incarcerated for almost 29 years - the equivalent of a 35 year prison term - nearly 14 years more than the national average sentence <u>and</u> double the average sentence imposed for the crime of murder in the Second Circuit last year. This disparity is clearly a factor which weighs in favor of a reduced sentence.

---

[10] <u>See</u> <u>e.g.</u>, <u>United States v. Halvon,</u> 26 F.4th 566, 570 (2d Cir. 2022) (holding that "a mandatory minimum sentence does not preclude a district court from reducing a term of imprisonment under 3582(c)(1)(A)").

Mr. Dupont also enjoys the support of an extraordinarily loving and devoted family. By all accounts, he has remained a central figure in the lives of his common law wife, children, and grandchildren - despite his life sentence. A few of their passages or pleas for mercy are clearly worth noting here. As Mr. DuPont's wife, Maria Bruni, wrote in her letter to Your Honor:

> Our son, Anthony, passed away tragically at the age of 18.
> And neither I nor Norman have ever fully recovered
> from his death ever since. He better understands loss now.
>
> I have remained faithful to Norman after all of these years
> and I raised our children, alone. And he has always tried
> as best he could to be a part of our lives in return. Norman
> has always encouraged me to keep faith and hope alive,
> and to pray for those that were affected by him. I have
> seen his sorrow and witnessed his growth over the years
> and believe he is truly remorseful and a changed man. He has
> always shown his love to me and his children, and I know that
> he has prayed for forgiveness from God.
>
> Norman is a much older man now, 74 years old, with
> hopefully a few good years left. I pray that you give
> those years to our family.

See Exhibit H.

As his daughter, also named Maria wrote:

> My father has always tried his best to remain a presence
> and be involved in my life all of these years. It's so sad
> that he has missed out on so many milestones - but he is
> painfully aware that he has no one to blame for this - but

himself.  I know he deeply regrets what he did and the pain it caused.

My father is near 75 years old now.  He is acutely aware that one day he will have to meet his maker.  I know that he has tried  so hard all these years to prove to us that he is a changed man.  And we are all proud of the change in him.

It would be a God-send for our family, especially my mother who has remained devoted to my father all of these years, for him to live out what time he has left with us.

Please answer our prayers.

Id.

As his son Norman Jr., explained:

My father has always been a positive influence in my daily life even though he has been away from us and in prison for so very long.  He was always a supportive father, and he has always remained a presence in our lives - albeit from afar....

But he knows that he has no one to blame for his absence from our lives but himself.  I know that he is ashamed of what he did - and if he could turn back the clock - he would. He is a far different and better man now.

As a grown adult, I have never been able to experience a normal relationship with my father outside of the barbed wire and confined walls of a prison setting.  We can never get back the time that he has missed, but it would bring us

immense joy to share all of life's occasions together as a family once again.  My father is near 75 years old now and has been away from us for near 30 years.  I pray daily that you can give us all another chance to be with him.

Id.

And, finally, as his son Ralph stated in his letter to Your Honor:

My father has been in prison for the majority of my life - since my freshman year of college.  He has been away from us for so long now - nearly three decades and he is now 74 years old.  I know that he is deeply ashamed and regretful for his conduct - and the lives that he irreparably hurt by it.  But he has tried to prove to us all ever since that he is redeemable and capable of change and he has changed so much....

My father has done everything he can from prison to remain a large part of our lives and has always encouraged me to do well and stay on the straight and narrow in life.  Because of my relationship with my father and his guidance, I have always strived to be a better man - graduating college, settling down and having a family, and having a great job with the DSNY for over 10 years....

It would be such a blessing to us all if he is able to live out the rest of his years with us.  He has already spent so much time away from us all - nearly 30 years.

Id.

Mr. DuPont's age and extraordinary rehabilitation also serve as strong indicators that he will not be a recidivist. The Bureau of Prisons **First Step Act Recidivism Assessment** also supports this assertion. Mr. DuPont has been a model inmate without a single disciplinary infraction for over 25 years. His work performance while imprisoned has also been nothing short of stellar - earning rave reviews from Bureau of Prisons staff. He was even recruited to be a mentor for new inmates by his jailers - helping new inmates adjust and assisting them in their own rehabilitation in various ways. Mr. DuPont has also improved himself over the years by obtaining his GED and successfully completing numerous vocational and educational programs offered by the Bureau of Prisons - all under the spectre of a life sentence.

Significantly, even Mr. DuPont's jailers - the individuals who have interacted with him on a daily basis for years - have endorsed a request for his release. As his Unit Team explained in pertinent part in Mr. DuPont's attached **Summary Reentry Plan - Progress Report:**

> Unit Team feels if he is given the opportunity to be released, he will be a productive citizen and will live the rest of his life as a model citizen.

See Exhibit D at **"General Comment"** section (emphasis supplied).

As set forth below, there is a substantial body of case law within the Eastern and Southern Districts of New York supporting Mr. DuPont's sentence reduction motion now. For example, in United States v Robin Scott Tellier, No. 92 Cr 869, (LGS) (S.D.N.Y. May 10, 2022) (ECF Doc 510), the defendant was the primary leader of a criminal organization known as the "Tellier Organization" that operated in the tri-state area from the late 70's until the early 90's. The jury in his case found that he had committed all of the charged racketeering predicate acts, which included murder, attempted murder and robbery - and he was sentenced to life imprisonment. As the court explained in granting Tellier's sentence reduction motion to time-served after having spent 29 years in prison:

> "Here, Defendant's rehabilitation, severe prison conditions and duration of his sentence already served together satisfy the extraordinary and compelling standard."

See ECF Doc 510 at 5 (emphasis supplied).

Judge Schofield found that the substantial amount of time that Tellier had already spent in prison - 29 years - was way above the nationwide average sentence imposed for murder. In support of reducing Tellier's sentence to time-served, she emphasized that the average federal sentence imposed nationwide for murder in the years 2015 thru 2021 was approximately 21.5 years. Id. at 8.

Judge Schofield also found the weight of the defendant's rehabilitation "remarkable," especially given his life sentence - that he had been a model inmate committed to self-improvement and helping others - that he completed his GED and over 40 vocational and educational programs - that he had maintained a good work

performance as reflected in his BOP Progress Report - and that had only two disciplinary infractions while imprisoned 29 years. Id. at 5.

Judge Schofield also noted in her ruling regarding Robin Tellier's sentence reduction motion that:

> Although a decision to reduce a sentence in never taken lightly, courts have granted such motions where defendants rehabilitation was extraordinary, even when the underlying conviction involved multiple or particularly violent murders.

Id. at 10-11.[11]

One such example is United States v. William Underwood, No. 88 Cr 822, 2021 WL 3204834 (S.D.N.Y. Jan. 15, 2021). In Underwood, the defendant was convicted of being the leader of a heroin distribution enterprise who was responsible for at least five brutal and calculated murders and one attempted murder. His violence was aimed at eliminating and intimidating competitors, informants and actual or potential witnesses. The court granted Underwood's sentence reduction motion after serving 33 years of a life sentence. As the court explained in granting Underwood's

---

[11] This past August, Tellier's codefendant and brother, Rene, brought a sentence reduction motion that was granted by the court on identical grounds. See United States v. Rene Tellier, 92 Cr 869 (LGS) (S.D.N.Y., August 25, 2023) (ECF Doc 555 at 5). Rene Tellier had been found guilty at trial of committing among other violent crimes, four murders and one attempted murder in connection with his leadership role in connection with the Tellier Organization. Id. at 1.

immediate release:

> Underwood, currently 67 years old and in the thirty-third
> year of his sentence, has now spent half his life in federal
> prison. The difference between these two halves could not be
> more pronounced. As discussed below, Underwood has by all
> accounts been a manifestly model inmate, a mentor to
> countless young men in custody, and an active and devoted
> father and grandfather, all while under the specter of a
> life-without-parole sentence.

Id. at *2.

Another example is United States v. Diego Rodriguez, 492
F.Supp 3d. 306 (S.D.N.Y. 2020). In Rodriguez, the defendant was
originally sentenced to life imprisonment for personally participating
in the brutal torture and murder of a confidential informant. At the
time of his sentence reduction motion, Rodriguez was 54 years old
and had served 20 years of a life sentence. Judge Rakoff granted
the motion and reduced Rodriguez's sentence to 30 years in prison
finding that his rehabilitation - together with the unique hardships
imposed by the pandemic - constituted extraordinary and compelling
circumstances under 3582(c)(1)(A). As Judge Rakoff explained in his
ruling:

> ...the pandemic, aside from posing a threat to Rodriguez's
> health, has made Rodriguez's incarceration harsher and more
> punitive than would otherwise have been the case. This is
> because the federal prisons, as prime candidates for the
> spread of the virus, have had to impose onerous lockdowns
> and restrictions that have made the incarceration of
> prisoners far harsher than normal. For someone with
> Rodriguez's health profile, the risk of suffering severe

health consequences if he contracts COVID-19, coupled
to the severe conditions imposed by the concomitant
lockdowns and restrictions that are necessary to ensure
Rodriguez's safety, means that the actual severity of
[Rodriguez's] sentence as a result of the COVID-19
outbreak exceeds what the Court anticipated at the time
of sentencing.

Id. at 311.

In another such case, United States v. Lewis, 00 Cr 1118, 2021
WL 3292180 (S.D.N.Y. Aug. 2, 2021), defendant Martin Lewis carried
out the contract murder of an organized crime member - stalking
and then executing the victim with a firearm - shooting him in the
cheek, neck, arm and torso - in exchange for $10,000.  He was
convicted of murder in aid of racketeering and sentenced to life in
prison.  Reducing Lewis' sentence from life imprisonment to 30
years, the court noted his age - 66 years old - and his asthma - as
well as his 20 year prison record reflecting no disciplinary infractions
and extensive course-work completion as extraordinary and
compelling reasons for the reduction.  Id. at *2.  The court also
relied upon in reducing Lewis' sentence that Lewis "ha[d]
strengthened his family ties [while imprisoned], speaking to his
youngest daughter Natalia almost daily."  Id. at *3.

In United States v Nickens, 11 Cr 317, 2021 WL 4487824
(N.D.N.Y. Sept. 14, 2021) the defendant Habakkuk Nickens was
convicted of murder.  He drove the vehicle from which a co-
defendant shot and killed a fellow gang member and was sentenced
to 240 months in prison for the crime in 2014.  The defendant while
incarcerated at MDC Brooklyn moved for compassionate release
arguing that he had asthma and that prison conditions there exposed
him to greater risk of contracting COVID-19, and also, that extensive

evidence of rehabilitation merited his immediate release. The court granted in part his request - reducing his sentence to 160 months in prison for participating in the murder. As the court explained:

> Overall, Defendant's health concerns are understandable, as COVID-19 could have a severe impact on a chronic asthma sufferer. However, given the current low number of cases at MDC Brooklyn and the ongoing vaccination effort, the risk to Defendant does not on its own rise to the level of an extraordinary and compelling reason for compassionate release.

Id. at *2. The court went on to find, however, that the defendant's rehabilitation and far-reaching impact on the lives of other inmates supported a finding of extraordinary and compelling reasons for a sentence reduction. Id. at *5.

In United States v. Ramsay, 538 F.Supp.3d 407 (S.D.N.Y. 2021), the court found that the then mandatory nature of the Guidelines life sentence originally imposed upon defendant Andrew Ramsay in 1998 - for murdering a man, a woman and her child who were innocent bystanders to the underlying dispute - was an additional "extraordinary and compelling" reasons for the reduction of his sentence to 30 years.

In United States v. Anthony Russo, 92 Cr 351 (FB), (E.D.N.Y. November 28, 1992) (ECF Doc 1911), Judge Block reduced the defendant's sentence from life imprisonment to 35 years - knowing he had already spent 29 years in prison. The defendant was convicted for his role in Colombo Crime Family War in the early 90's, including his involvement in two murders. Judge Block found that Russo had demonstrated extraordinary and compelling reasons to warrant the reduction. The reasons included his extraordinary

rehabilitation and role as a model inmate, and the restrictions at FCC Allenwood during the pandemic having made his incarceration much more punitive than normal.  See ECF Doc 1911 at 12-13 and 15-16.[12]

Finally, this Court in United States v. Tyrone King, 00 Cr 1108 (RJD), ordered the defendant's sentence to be reduced from life imprisonment to 30 years on November 9, 2023.  King was convicted of offenses related to his leadership role in a violent gang that distributed crack cocaine.  See ECF Doc 448-1.  The Court sentenced King to life imprisonment in the case based upon his violent conduct, including the murder of an individual Ronald Mitchell.  See ECF Doc 382 at 3-4.  King's sentence reduction was granted on dual grounds - Section 404 of the First Step Act, and also, pursuant to the same statute that Mr. DuPont's sentence reduction motion is predicated upon here, 18 USC 3582(c)(1)(A)(I).  See ECF Doc 448-1, at 11, fn.1.

Your Honor found that the information contained within "counseled" brief that was ultimately submitted on King's behalf served to justify his reduction in sentence under the 3553(a) factors. This was notwithstanding the fact that Your Honor had denied a previous pro se sentence reduction motion filed by King a few years earlier - under the 3553(a) factors.  See ECF Doc 382 at 2-4.  In the recent brief that was filed on King's behalf by the Federal Defenders Office - they were far better equipped to demonstrate for the Court, the extraordinary rehabilitative efforts undertaken by King while

_____

[12] Russo had not committed a single disciplinary infraction in over 20 years - he completed more than 40 educational courses in addition to obtaining his GED - and he maintained a steady work assignment with a glowing review from his supervisor. During the lengthy pandemic, he was also subjected to 24-hour lockdowns for long stretches and was not permitted to have family visits for over a year.  Id.

incarcerated. Indeed, in granting King's sentence reduction motion under 3582(c)(1)(A)(I), the Court said:

> As an initial matter, neither the risk of contracting COVID-19 in prison nor King's mere choice to go to trial rather than accept a plea agreement constitute extraordinary or compelling reasons warranting compassionate release....
>
> That said, the disparity between King's sentence and that which he would have received today coupled with the remarkable rehabilitation discussed above, constitute extraordinary and compelling reasons warranting compassionate release.... And as discussed with regards to King's Section 404 motion, the Section 3553(a) factors weigh in favor of reducing King's time in prison.

Id. at 11-12, fn. 3.[13]

---

[13] Numerous courts nationwide have granted sentence reductions to prisoners serving life sentences notwithstanding convictions for murder. See e.g., United States v. Lara, 95 Cr 75 (JJM), 2023 WL 2305938 (D.R.I. March 1, 2023) (reducing life sentence to time-served after almost 28 years imprisonment for a former Latin King convicted for his role in a carjacking and murder); United States v Perez, 02 Cr 7 (JBA), 2021 WL 837425 (D.Ct. March 4, 2021) (reducing life sentence to time-served after approximately 20 years imprisonment for defendant convicted of "four crimes related to the murder of Theodore Casiano" conspiracy to commit interstate murder-for-hire, interstate travel to commit murder-for-hire, violent crime in aid of racketeering and causing death by the use of a firearm during and in relation to a crime of violence).

Simply put, the Court should apply same rationale here as employed in <u>King</u>. As this Court stated in <u>King</u>:

> There are no guarantees, and I do not come to this decision lightly. Yet I am of the view that if rehabilitation is to be the true goal of our criminal justice system, then clear evidence of rehabilitation such as presented by King must be recognized to ensure the integrity of that system.

<u>Id</u>. at 10-11.

Mr. DuPont has already served the equivalent of a 35 year prison term. His rehabilitation over the years has also been nothing short of extraordinary. If rehabilitation is the true goal of our criminal justice system, then the clear evidence of Mr. DuPont's rehabilitation that has now been presented should also be recognized.

For all of the foregoing reasons, I am most respectfully asking Your Honor to reduce Mr. DuPont's sentence and order his immediate release. Please allow him to return home to his loved ones for his remaining years.

Respectfully submitted,

/JRF/

James R. Froccaro, Jr.

JRF:pa
Encls.

Exhibit A

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case                                   (NOTE: Identify Changes with Asterisks (*))
Sheet 1

# UNITED STATES DISTRICT COURT

Eastern District of New York

| UNITED STATES OF AMERICA | ) | **AMENDED JUDGMENT IN A CRIMINAL CASE** |
| | ) | |
| v. | ) | |
| | ) | Case Number:  CR 95-91(S)(RJD) |
| NORMAN DUPONT | ) | USM Number: 30147-048 |
| | ) | |
| **Date of Original Judgment:**   3/5/1996 | ) | ROBERT W. GEORGES, ESQ. |
| *(Or Date of Last Amended Judgment)* | ) | Defendant's Attorney |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   one, two, three, four, five and six to a six count superseding indictment.
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 1959(a)(5) | Conspiracy to commit murder in aid of racketeering. | 2/10/1990 | 1(S) |
| 18 USC 1959(a)(1) | Murder in aid of racketeering. | 2/10/1990 | 2(S) |

The defendant is sentenced as provided in pages 2 through ___9___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)  all open counts _____ ☐ is  ☑ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

                      6/7/2021
                      Date of Imposition of Judgment

           s/RJD        /S/ Raymond J. Dearie
           Signature of Judge

           RAYMOND J. DEARIE        U.S.D.J.
           Name and Title of Judge

                      6/7/2021
           Date

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 1A

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page __2__ of __9__

DEFENDANT:  NORMAN DUPONT
CASE NUMBER:  CR 95-91(S)(RJD)

# ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 1951 | Conspiracy to commit extortion. | 12/31/1993 | 3(S) |
| 18 USC 1951 | Extortion. | 12/31/1993 | 4(S) |
| 18 USC 924(c)(1) | Use of a firearm during the commission of a crime of violence. | 2/10/1990 | 5(S) |
| 18 USC 924(c)(1) | Use of a firearm during the commission of a crime of violence. | 1/31/1991 | 6(S) |

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 2 — Imprisonment

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page __3__ of __9__

DEFENDANT: NORMAN DUPONT
CASE NUMBER: CR 95-91(S)(RJD)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of :
(*)          LIFE, plus five years.    (see page 4)

☐     The court makes the following recommendations to the Bureau of Prisons:

☐     The defendant is remanded to the custody of the United States Marshal.

☐     The defendant shall surrender to the United States Marshal for this district:

   ☐   at _____ ☐ a.m. ☐ p.m.   on _____ .

   ☐   as notified by the United States Marshal.

☐     The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐   before 2 p.m. on _____ .

   ☐   as notified by the United States Marshal.

   ☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245C (Rev. 09/19)  Amended Judgment in a Criminal Case
Sheet 2A — Imprisonment

(NOTE: Identify Changes with Asterisks (*))

Judgment—Page __4__ of __9__

DEFENDANT: NORMAN DUPONT
CASE NUMBER: CR 95-91(S)(RJD)

## ADDITIONAL IMPRISONMENT TERMS

Total Term of Life on Counts 1(S), 2(S), 3(S) and 4(S);  plus five years on  Count 5(S) to run consecutively to the sentences imposed on counts 1(S) through 4(S).


(*)  Pursuant to the Memorandum & Order dated 5/3/2021 (copy attached), the conviction and sentence on Count 6 is vacated and this Amended Judgment is issued.

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
  Sheet 3 — Supervised Release

(NOTE: Identify Changes with Asterisks (*))

Judgment—Page __5__ of __9__

DEFENDANT: NORMAN DUPONT
CASE NUMBER:   CR 95-91(S)(RJD)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

FIVE(5) YEARS AS FOLLOWS:

COUNTS 1(S), 3(S), 4(S) and 5(S):        THREE(3) YEARS TO RUN CONCURRENTLY;

COUNT 2(S):                              FIVE(5) YEARS TO RUN CONCURRENTLY TO COUNTS 1(S), 3(S), 4(S) and 5(S).

(*)  COUNT 6(S) WAS VACATED.

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
        ☐   The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.   ☐   You must make restitution in accordance with 18 U.S.C. § 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.   ☑   You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.   ☐   You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.   ☐   You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245C (Rev. 09/19)  Amended Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | Judgment—Page | 6 | of | 9 |
|---|---|---|---|---|

DEFENDANT:  NORMAN DUPONT
CASE NUMBER:  CR 95-91(S)(RJD)

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
          Sheet 5 — Criminal Monetary Penalties
                                                                            (NOTE: Identify Changes with Asterisks (*))

Judgment — Page   __7__   of   __9__

DEFENDANT: NORMAN DUPONT
CASE NUMBER: CR 95-91(S)(RJD)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 250.00 | $ | $ | $ | $ |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be
      entered after such determination.

☐  The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

      If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in
      the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid
      before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| **TOTALS** | $      0.00 | $      0.00 | |

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the
      fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject
      to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

      ☐  the interest requirement is waived for   ☐  fine   ☐  restitution.

      ☐  the interest requirement for the   ☐  fine   ☐  restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on
or after September 13, 1994, but before April 23, 1996.

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
    Sheet 5A — Criminal Monetary Penalties

(NOTE: Identify Changes with Asterisks (*))

Judgment—Page   8   of   9  

DEFENDANT:   NORMAN DUPONT
CASE NUMBER:   CR 95-91(S)(RJD)

## ADDITIONAL TERMS FOR CRIMINAL MONETARY PENALTIES

SPECIAL ASSESSMENT: $250.00
  FIFTY DOLLLARS ON EACH COUNT.

AO 245C (Rev. 09/19)  Amended Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page __9__ of __9__

DEFENDANT:  NORMAN DUPONT
CASE NUMBER:  CR 95-91(S)(RJD)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A  ☑  Lump sum payment of $ __250.00__ due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number
Defendant and Co-Defendant Names
*(including defendant number)* | Total Amount | Joint and Several
Amount | Corresponding Payee,
if appropriate. |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

Exhibit B

--------------------------------------------------------------------------------

FROM: Froccaro, James
TO: 30147048
SUBJECT: Administrative Request
DATE: 05/21/2023 09:06:05 PM

5/22/2023

Warden
FCI Fort Dix
5756 Hartford & Pointville Road
Joint Base MDL, NJ 08640

Dear Warden:

I'm writing to request compassionate release under 18 USC 3582(c)(1)(A). The extraordinary and compelling reasons for this relief are, among other things, (1) my age; (2) the length of my imprisonment and model behavior while incarcerated; and (3) COVID-19-related restrictions, including those that have prevented visitation with my altogether and continue to prevent visitation/contact with loved ones.

I will be 74 years old in September and am presently serving a life sentence for murder. I have been in prison for this crime over 28 years now and have been a model inmate, highly respected by staff and inmates alike.

In addition to the ever present risks to my health, COVID-19 has greatly impacted my quality of life and conditions of imprisonment. Pandemic-related restrictions have, among other hardships, interfered with my visitation privileges and kept me from spending time and having any physical contact with my family.

I ask that you please consider releasing me to my loved ones.

Sincerely, Norman DuPont

Norman DuPont
Reg. No. 30147-048

Exhibit C

POSITIVE DECISION REPORT

U.S. DEPARTMENT OF JUSTICE                          FEDERAL BUREAU OF PRISONS

| 1. Institution: FTD | | | |
|---|---|---|---|
| 2. Inmate's Name<br>Dupont, Norman | 3. Register Number<br>#30147-048 | 4. Date of Incident<br>N/A | 5. Time<br>N/A |
| 6. Place of Incident<br>FCI Fort Dix | 7. Assignment<br>5841 Orderly | 8. Unit<br>5841 | |

| 9. Positive Behavior Demonstrated in Institution Related to ISDS: | |
|---|---|
| Daily Living Skills<br>Mental Health Skills<br>Wellness Skills<br>Interpersonal Skills<br>Academic Skills | Cognitive Skills<br>Vocational/Career Skills<br>Leisure Time Skills<br>Character Skills |

10. Justification (Description of Positive Behavior)

Inmate Dupont #30147-048 has continued to show exemplary behavior while housed at FCI Fort Dix. He has maintained clear conduct, continuously working in 5841 as an orderly, where he has efficiently maintained assigned areas of responsibility.  Inmate Dupont #30147-048 is also a go to inmate in the Unit.  When called upon by Unit Team to assist with a task, he completes the assignment without hesitation.  It is the opinion of inmate Dupont #30147-048 Unit Team that his institutional adjustment can be deemed as Outstanding by his demeanor and character.  It may be cliché to state, but Inmate Dupont #30147-048 is an all-around model inmate.

| 11. Printed Name/Signature of Reporting Employee<br>Louis Kwartin | 12. Date<br>6/21/22 |
|---|---|
| 13. Approved by (Signature and title)<br>Unit Manager | 14. Date<br>6/21/22 |

Exhibit D




| | | | |
|---|---|---|---|
| Facility: | FTD  FORT DIX FCI | Custody Level: | IN |
| Name: | DUPONT, NORMAN | Security Level: | LOW |
| Register No.: | 30147-048 | Proj. Rel Date: | UNKNOWN |
| Quarters: | W02-331L | Release Method: | LIFE |
| Age: | 73 | DNA Status: | GIL02837 / 06-06-2011 |
| Date of Birth: | 09-17-1949 | | |

## Contact Information

Release contact & address
Maria  Bruni, WIFE
428 83rd St., Brooklyn, NY 11209 US
phone (home) : 347-647-0564

## Offenses and Sentences Imposed

| Charge | Terms In Effect |
|---|---|
| CT.1: CONSP TO MURDER IN AID OF RACK / 18:1959(A)(5); CT.2: MURDER IN AID OF RACK / 18:1959(A)(1); CT.3: CONSP TO COMMIT EXTORTION / 18:1951; CT.4: EXTORTION / 18:1951; | LIFE |
| 18:924(C)(1) USE OF F/A DURING THE COMMISSION OF A CRIME OF VIOLENCE (CT5,6) | 5 YEARS |

Date Sentence Computation Began:  03-05-1996

Sentencing District:  NEW YORK, EASTERN DISTRICT

| Days FSGT / WSGT / DGCT | Days GCT or EGT / SGT | Time Served | + Jail Credit - InOp Time |
|---|---|---|---|
| 0 /    0 /    0 | 0 | Years: 28 Months: 0 Days: | + 327    JC  -0    InOp |

## Detainers

| Detaining Agency | Remarks |
|---|---|
| NO DETAINER | |

## Program Plans

Since inmate Dupont's arrival at FCI Fort Dix, he has not been considered to be a management concern.  Unit Team recruited inmate Dupont to be an inmate mentor to the new inmates who arrive in the unit.  Inmate Dupont is housed in the Unicor/Admission and Orientation Unit.  Due to inmate Dupont's clear conduct and mentorship he provides to newly assigned inmates, he has earned the respect of the inmates.  He currentll has a Life Sentence and is one of a few inmates who are currently housed in this unit who have that sentence.

## Current FSA Assignments

| Assignment | Description | Start |
|---|---|---|
| FTC INELIG | FTC-INELIGIBLE-REVIEWED | 12-02-2019 |
| INELIG AUT | FTC-INELIGIBLE OFF CODE - AUTO | 12-17-2019 |
| N-ANGER N | NEED - ANGER/HOSTILITY NO | 01-05-2023 |
| N-ANTISO N | NEED - ANTISOCIAL PEERS NO | 01-05-2023 |
| N-COGNTV Y | NEED - COGNITIONS YES | 01-05-2023 |
| N-DYSLEX N | NEED - DYSLEXIA NO | 05-30-2021 |
| N-EDUC N | NEED - EDUCATION NO | 01-05-2023 |
| N-FIN PV N | NEED - FINANCE/POVERTY NO | 01-05-2023 |
| N-FM/PAR N | NEED - FAMILY/PARENTING NO | 01-05-2023 |
| N-M HLTH N | NEED - MENTAL HEALTH NO | 01-05-2023 |
| N-MEDICL Y | NEED - MEDICAL YES | 01-05-2023 |
| N-RLF N | NEED - REC/LEISURE/FITNESS NO | 01-05-2023 |
| N-SUB AB N | NEED - SUBSTANCE ABUSE NO | 01-05-2023 |
| N-TRAUMA Y | NEED - TRAUMA YES | 01-05-2023 |
| N-WORK Y | NEED - WORK YES | 01-05-2023 |
| R-MIN | MINIMUM RISK RECIDIVISM LEVEL | 01-05-2023 |

## FSA Comments

Due to inmate Dupont's current Life Sentence and crime, he is not eligible to receive FSA credits.  Although, he is not eligible to receive



**Summary Reentry Plan - Progress Report**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: DUPONT, NORMAN 30147-048

SEQUENCE: 00311702
Report Date: 04-27-2023

FSA credits, he encourages inmates who are eligible to enroll in classes and conduct themselves appropriately.

## Current Work Assignments

| Facl | Assignment | Description | Start |
|------|-----------|-------------|-------|
| FTD | 5841 ORD W | UNIT ORDERLY - 5841 | 11-02-2021 |

## Work Assignment Summary

Inmate Dupont is assigned as an Orderly and Mentor in the building. His work reports indicated he needs no supervision and takes the lead role on projects in the unit. He is considered to be well respected in the unit and is always willing to take on additional duties in order to get the job completed.

## Current Education Information

| Facl | Assignment | Description | Start |
|------|-----------|-------------|-------|
| FTD | ESL HAS | ENGLISH PROFICIENT | 05-09-1996 |
| FTD | GED HAS | COMPLETED GED OR HS DIPLOMA | 05-09-1996 |

## Education Courses

| SubFacl | Action | Description | Start | Stop |
|---------|--------|-------------|-------|------|
| FTD GP | C | CAPITAL MARKETS 1 | 02-01-2022 | 04-22-2022 |
| FTD GP | C | HEALTHY MINDS AND BODIES | 08-01-2021 | 09-16-2021 |
| FTD GP | C | CAPITAL MARKETS 1 | 08-23-2020 | 11-08-2020 |
| FTD GP | C | NONMETALS IN THE PLAN 106 | 10-20-2020 | 10-30-2020 |
| FTD GP | C | BUSINESS MATH | 07-31-2020 | 09-15-2020 |
| FTD GP | C | TPC:READING | 01-18-2020 | 02-18-2020 |
| FTD GP | C | BLUEPRINT READING | 01-03-2020 | 02-03-2020 |
| FTD GP | C | TECHNICAL MATH - WEST | 10-05-2019 | 01-06-2020 |
| SCH | C | FCI BLOOD PRESSURE - RPP 1 | 04-18-2019 | 04-21-2019 |
| SCH | C | ACE INVESTING 101 | 01-04-2019 | 02-15-2019 |
| SCH | C | ACE REAL ESTATE I | 08-22-2018 | 11-07-2018 |
| SCH | C | CHESS OPENING COURSE | 02-28-2012 | 05-08-2012 |
| GIL | C | MENTAL HEALTH MGT | 03-22-2006 | 03-22-2006 |
| GIL | C | EMPLOYMENT TOOLS | 03-22-2006 | 03-22-2006 |
| GIL | C | INFORMATION/COMMUNITY | 03-22-2006 | 03-22-2006 |
| GIL | C | RELEASE PROCEDURES | 03-22-2006 | 03-22-2006 |
| GIL | C | DISEASE PREVENTION | 03-22-2006 | 03-22-2006 |
| GIL | C | HEALTH AND NUTRITION | 03-22-2006 | 03-22-2006 |
| GIL | C | SPIRITUAL GROWTH | 03-22-2006 | 03-22-2006 |
| GIL | C | PERSONAL FINANCE/CONSUMER SKIL | 03-22-2006 | 03-22-2006 |
| ALP | W | SWISSBALL FITNESS MON 12:20PM | 04-12-2004 | 04-28-2004 |
| ALP | W | PLYO/MEDICINE BALL SAT 0830 | 04-05-2004 | 04-28-2004 |
| ALP | C | PLYO/MEDICINE BALL SAT 0830 | 01-03-2004 | 04-01-2004 |
| ALP | C | SWISSBALL FITNESS MON 12:20PM | 01-03-2004 | 04-01-2004 |
| ALP | C | SWISSBALL FITNESS MON 12:20PM | 10-12-2003 | 01-03-2004 |
| ALP | C | PLYO/MEDICINE BALL SAT 0830 | 10-10-2003 | 01-03-2004 |
| ALP | C | PLYO/MEDICINE BALL SAT 0830 | 10-06-2002 | 12-30-2002 |
| ALP | C | SWISSBALL FITNESS MON 12:20PM | 10-06-2002 | 12-30-2002 |
| ALP | C | SWISSBALL FITNESS MON 12:20PM | 07-28-2002 | 09-25-2002 |
| ALP | C | PLYO/MEDICINE BALL SAT 0830 | 07-28-2002 | 09-25-2002 |
| ALP | C | SWISSBALL FITNESS MON 12:20PM | 04-04-2002 | 07-05-2002 |
| ALP | C | PLYO/MEDICINE BALL SAT 0830 | 04-08-2002 | 07-05-2002 |
| ALP | C | WORKING WITH THE HOMELESS | 10-15-2000 | 12-29-2000 |
| ALP | C | PUBLIC SPEAKING | 10-15-2000 | 12-29-2000 |
| ALP | C | LIFE SKILLS WORKSHOP | 10-15-2000 | 12-29-2000 |
| ALP | C | VIDEO INTERPRETATION | 10-15-2000 | 12-29-2000 |
| ALP | C | STARTING A BUSINESS | 10-15-2000 | 12-29-2000 |
| ALP | C | SWISSBALL FITNESS MON 12:20PM | 03-31-2000 | 06-29-2000 |
| ALP | C | PLYO/MEDICINE BALL SAT 0830 | 01-05-2000 | 03-30-2000 |



**Summary Reentry Plan - Progress Report**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: DUPONT, NORMAN  30147-048

SEQUENCE: 00311702
Report Date: 04-27-2023

## Education Information Summary

Since his arrival, the unit has been on a locked down status due to COVID. This has made programing in the Educational Department close to impossible. Inmate Dupont has taken it upon himself to assist with helping inmates who have issues with obtaining there GED and has assisted the newly arrived inmates with what classes they should take in order to assist them with their Re-Entry needs.

## Discipline Reports

| Hearing Date | Prohibited Acts |
| --- | --- |
| 08-28-1997 | 201 : FIGHTING WITH ANOTHER PERSON |
| 12-29-1995 | 201 : FIGHTING WITH ANOTHER PERSON |

## Discipline Summary

Inmate Dupont has not received an incident report since 1995.

## ARS Assignments

| Facl | Assignment | Reason | Start | Stop |
| --- | --- | --- | --- | --- |
| FTD GP | A-DES | OTHER AUTH ABSENCE RETURN | 11-02-2021 | CURRENT |
| FTD GP | A-DES | OTHER AUTH ABSENCE RETURN | 11-01-2021 | 11-02-2021 |
| FTD GP | A-DES | TRANSFER RECEIVED | 08-20-2019 | 11-01-2021 |
| SCH | A-DES | OTHER AUTH ABSENCE RETURN | 06-18-2012 | 08-05-2019 |
| SCH | A-DES | TRANSFER RECEIVED | 11-07-2011 | 06-18-2012 |
| GIL | A-DES | OTHER AUTH ABSENCE RETURN | 08-07-2008 | 11-01-2011 |
| GIL | A-DES | OTHER AUTH ABSENCE RETURN | 06-16-2008 | 08-07-2008 |
| GIL | A-DES | OTHER AUTH ABSENCE RETURN | 06-13-2008 | 06-16-2008 |
| GIL | A-DES | OTHER AUTH ABSENCE RETURN | 04-29-2008 | 06-13-2008 |
| GIL | A-DES | OTHER AUTH ABSENCE RETURN | 03-18-2008 | 03-18-2008 |
| GIL | A-DES | TRANSFER RECEIVED | 06-04-2004 | 03-08-2008 |
| ALP | A-DES | WRIT RETURN | 09-18-2003 | 04-28-2004 |
| ALP | A-DES | OTHER AUTH ABSENCE RETURN | 01-15-2003 | 02-11-2003 |
| ALP | A-DES | OTHER AUTH ABSENCE RETURN | 11-18-2002 | 01-15-2003 |
| ALP | A-DES | OTHER AUTH ABSENCE RETURN | 11-17-1999 | 11-15-2002 |
| ALP | A-DES | OTHER AUTH ABSENCE RETURN | 11-16-1999 | 11-17-1999 |
| ALP | A-DES | TRANSFER RECEIVED | 04-10-1996 | 11-16-1999 |

## Current Care Assignments

| Assignment | Description | Start |
| --- | --- | --- |
| CARE1-MH | CARE1-MENTAL HEALTH | 06-22-2010 |
| CARE2 | STABLE, CHRONIC CARE | 05-29-2008 |

## Current Medical Duty Status Assignments

| Assignment | Description | Start |
| --- | --- | --- |
| C19-RCVRD | COVID-19 RECOVERED | 12-29-2020 |
| LOWER BUNK | LOWER BUNK REQUIRED | 04-10-2023 |
| NO PAPER | NO PAPER MEDICAL RECORD | 08-21-2019 |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 04-09-2015 |
| YES F/S | CLEARED FOR FOOD SERVICE | 08-23-2019 |

## Current PTP Assignments

| Assignment | Description | Start |
| --- | --- | --- |

*NO ASSIGNMENTS*

## Current Drug Assignments

| Assignment | Description | Start |
| --- | --- | --- |
| DRG I NONE | NO DRUG INTERVIEW REQUIRED | 04-22-1996 |

## Physical and Mental Health Summary

Unit Team is not aware of any medical conditions which have been made available.

## FRP Payment Plan



# Summary Reentry Plan - Progress Report
### Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: DUPONT, NORMAN  30147-048

| Most Recent Payment Plan |
|---|

**FRP Assignment:**     **COMPLT**     **FINANC RESP-COMPLETED**     **Start: 05-11-1997**

**Inmate Decision:**     **AGREED**     **$200.00**     Frequency: **SINGLE**

Payments past 6 months:     **$0.00**     Obligation Balance: **$0.00**

| Financial Obligations | | | | | |
|---|---|---|---|---|---|
| No. | Type | Amount | Balance | Payable | Status |
| 1 | ASSMT | $300.00 | $0.00 | IMMEDIATE | COMPLETEDZ |

*** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ***

## Financial Responsibility Summary

Inmate Dupont does not currently have any Financial obligations.

## Release Planning

Release plans have been discussed with inmate Dupont. He has indicated if his sentence is reduced or if he receives a compassionate release, he will release with his family in New York.

## General Comments

Unit Team has had the opportunity to see the impact inmate Dupont has made on some of the inmates he interacts with. Due to him having a Life Sentence, many inmates as well as staff are amazed at how he has a positive attitude and enjoys life everyday. Unit Team feels if he is given the opportunity to release, he will be a productive citizen and will live the rest of his life as a model citizen.



**Summary Reentry Plan - Progress Report**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: DUPONT, NORMAN 30147-048

SEQUENCE: 00311702
Report Date: 04-027-2023

Name: DUPONT, NORMAN
Register Num: 30147-048
Age: 73
Date of Birth: 09-17-1949
DNA Status: GIL02837 / 06-06-2011

_____
Inmate   (DUPONT, NORMAN, Register Num: 30147-048)

4/27/23
_____
Date


_____
Chairperson

4/27-23
_____
Date


_____
Case Manager

4/27/23
_____
Date

Exhibit E



_Federal Correctional Institution_          _Fort Dix, NJ 08640_

**DATE:** 04/04/2023

**ATTN OF:** To whom it may concern.

**FROM:** Senior Officer Specialist R. Wilson
          Federal Correctional Law Enforcement Officer

**SUBJECT:** Inmate Dupont Register Number 30147-048

    I, Senior Officer Specialist R. Wilson, have observed, witnessed, and overseen inmate Norman Dupont, while performing and assuming the duties of 5841 Housing Unit Officer. Inmate Norman Dupont has conducted himself with integrity, professionalism, and proficiency. He has a very good worth ethic. As a housing unit orderly, and a former laundry orderly, inmate Norman Dupont has fulfilled his tasks and completed his assignments. His performance level has been excellent and satisfactory. 5841 Unit Team, which consists of a Unit Manager, two Case Managers, two Counselors, and a Secretary, has deemed inmate Norman Dupont as a trustworthy asset to the orderly, systematic, running of the housing unit. During his work period as a Housing Unit Laundry Orderly, he washed, dried, folded, and distributed the laundry of 170-330 inmates on a weekly basis. During his work period as a Housing Unit Orderly, he participated in cleaning and maintaining the sanitation of the housing unit, which consists of sweeping, mopping, wiping down surfaces, moving furniture, waxing, buffing, and removing trash.

    Inmate Norman Dupont works well with others. He has helped and guided new inmates with adapting, coping, and becoming acclimated with the prison environment. He deters negative behavior. He follows the rules, policies, and guidelines without deviating. He has been a model inmate to the inmate community. Inmate Norman Dupont is respectful and compliant to staff. His behavior emulates a man who aims to be law abiding citizen and desires to return back to society. Inmate Norman Dupont has been incident report free for over 25 years. A noteworthy accomplishment.

    Inmate Norman Dupont has completed courses in the Education Department. He has used his time wisely in participating in courses that help with life skills.

Senior Officer Specialist
Federal Correctional Law Enforcement Officer
R. Wilson

Exhibit F

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| | |
|---|---|
| Register Number: 30147-048 | Risk Level Inmate....: R-MIN |
| Inmate Name | General Level......: R-MIN (-6) |
| Last.........: DUPONT | Violent Level......: R-MIN (3) |
| First........: NORMAN | Security Level Inmate: HIGH |
| Middle.......: | Security Level Facl..: LOW |
| Suffix.......: | Responsible Facility.: FTD |
| Gender.........: MALE | Start Incarceration..: 03/05/1996 |

**PATTERN Worksheet Summary**

| Item | - Value | - General Score | - Violent Score |
|---|---|---|---|
| Current Age | 73 | 0 | 0 |
| Walsh w/Conviction | FALSE | 0 | 0 |
| Violent Offense (PATTERN) | TRUE | 5 | 7 |
| Criminal History Points | 2 | 8 | 3 |
| History of Escapes | 0 | 0 | 0 |
| History of Violence | 1 | 1 | 2 |
| Education Score | HighSchoolDegreeOrGED | -2 | -2 |
| Drug Program Status | NoNeed | -6 | -3 |
| All Incident Reports (120 Months) | 0 | 0 | 0 |
| Serious Incident Reports (120 Months) | 0 | 0 | 0 |
| Time Since Last Incident Report | 304 | 0 | 0 |
| Time Since Last Serious Incident Report | 304 | 0 | 0 |
| FRP Refuse | FALSE | 0 | 0 |
| Programs Completed | 13 | -12 | -4 |
| Work Programs | 0 | 0 | 0 |
| | Total | -6 | 3 |

Exhibit G


Advertisement

NEWS

# 'Absolute chaos and terrifying.' The coronavirus is running rampant through N.J. prison again.

Updated: Jan. 06, 2021, 8:33 a.m. | Published: Jan. 05, 2021, 3:36 p.m.



By **Joe Atmonavage | NJ Advance Media for NJ.com**

A little more than a month after Fort Dix prison reported the most coronavirus cases of any federal facility in the country, an assistant U.S. Attorney wrote to a federal judge that the correctional institution had the virus under control with only 13 inmates positive as of Dec. 17.

Fast forward to now and Fort Dix is once again the epicenter of the virus in the federal prison system less than three weeks after the first significant wave was tamped down. Nearly 600 inmates out of 2,700 are positive with the virus as of Tuesday, putting the low-security prison once again at the top of the list for the number of cases in the federal prison system, according to the BOP.

Advertisement

In interviews and court documents, inmates and their families said the situation is getting worse by the day as the outlook becomes increasingly dire.

"It is inhumane the way they are being treated," said Jane Pomroff, whose son has 15 months left on his sentence for drug charges.

While assistant U.S. Attorney Angelica M. Sinopole wrote to a federal judge in December that the Bureau of Prisons (BOP) has taken "proper steps to prevent further spread of infection and many of the infected individuals already have recovered," inmates describe a different scene.

Siddeeq Williams, who is serving a 10-year sentence on drug distribution charges, said he is still suffering from symptoms after contracting the virus in October. His pleas for medical help were being ignored, Williams wrote to a federal judge, adding that the number of cases would be "staggering" if the prison were actively testing inmates, according to court documents.

"Your honor, this is a cry for help," Williams wrote to the judge on Jan. 2. "I am in the middle of the largest COVID-19 outbreak in the federal prison system and I'm sick. I don't want to die here. Please send me home where I can get the medical help I need."

"My cries for help are being ignored," the father of five wrote.

Tess Borden, an attorney for the American Civil Liberties Union (ACLU) who has been monitoring the prison's response to the pandemic, said the "BOP has failed to keep these people in its custody safe and healthy," including properly testing, quarantining and releasing inmates.

"Every time I speak to someone at Fort Dix or to their families, I hear desperation on the other end of the line," she said. "People fear for their lives."

Federal lawmakers from New Jersey demanded the prison come up with a plan in November to prevent a future outbreak and halt the transfer of inmates to the prison.

"The BOP has had months to devise a plan to control the outbreak and stop the spread and they failed. It's shameful," U.S. Sen. Robert Menendez said in a statement to NJ Advance Media. "With cases on the rise again at FCI Fort Dix, I urge the BOP to take this seriously and do everything possible to protect the health and safety of the staff and incarcerated individuals."

The BOP did not respond to a request for comment.

The agency said in November there was "no evidence" the significant outbreak that started in late October was connected to the transfer of nearly 300 inmates, including more than a dozen who tested positive for the virus, into the prison, though the spike in cases coincided with the outbreak.

The BOP halted transfers until Nov. 23, but have since resumed them, according to court documents and family members of inmates.

One woman, who asked not to be identified out of fear of retaliation for her son, said her son was transferred from Ray Brook federal prison in New York to Fort Dix in mid-December. She said he was placed in quarantine with around 60 other inmates who had also been transferred in from around the country.

He received two negative tests upon leaving Ray Brook, she said. He has since tested positive for COVID-19 while being held at Fort Dix. He is quarantining in "horrible conditions" with no hot water, his mother said. He is set to be released as early as Feb. 2.

"It's like they sending you to Fort Dix to try and kill you," the woman said. "Why would they send you there when you have a short amount of time like him?"

Larry Murphy, who began serving his sentence amid the pandemic, told a federal judge that after quarantining at the prison for 30 days after turning himself in, he was placed in a unit with a "large number of people (who) are still sick and exhibiting symptoms."

"I would ask your Honor or to simply google search "FCI Fort Dix Coronavirus," and read about this specific building where I'm currently housed," Murphy wrote.

The building where he is housed, 5812, is where Troy Wragg, who has epilepsy, and more than 200 other inmates were housed when they contracted the virus. Wragg's wife said her husband has been sick for more than a month and has a severe upper respiratory infection that affects his breathing.

"It's absolute chaos and terrifying for everyone," Wragg said in a message via his wife. "Our health and lives are at risk and there's been no true signs of trying to fix this whatsoever. Many of us, including myself, have severe lingering health complications due to our COVID-19 diagnosis that could have absolutely been avoided."

Borden, of the ACLU, said people inside have told her there have been outbreaks throughout the prison — on the east and west side, as well as the minimum security camp where more than 150 inmates live in open-air dormitories. One inmate living in the camp wrote in a Dec. 28 court filing that he hadn't even had his temperature taken by staff in months and predicted "it will be no surprise if the numbers increase dramatically" after a number of inmates showed symptoms of the virus.

"We're hearing reports of extreme sickness, inadequate medical care, widespread fear and a sense of helplessness," Borden said.

On Monday, U.S. District Judge Renee Marie Bumb ordered the government to "provide a status update regarding the efforts being taken by the Bureau of Prisons to address the apparent COVID-19 outbreak at FCI Fort Dix."

**Our journalism needs your support. Please subscribe today to NJ.com.**

*Joe Atmonavage may be reached at jatmonavage@njadvancemedia.com.*

**Have a tip? Tell us: nj.com/tips.**

# Burlington County Times

# 'Clear and present danger': U.S. Rep. Kim calls for FCI Fort Dix lockdown as cases top 800

 **George Woolston**
Burlington County Times

Published 7:19 p.m. ET Jan. 11, 2021 | Updated 3:20 p.m. ET Jan. 12, 2021

JOINT BASE McGUIRE-DIX-LAKEHURST — U.S. Rep. Andy Kim is demanding the federal Bureau of Prisons (BOP) institute a lockdown as COVID-19 continues to tear through FCI Fort Dix.

Kim on Monday called for BOP Director Michael Carvajal to take immediate action at the federal prison where the number of active COVID-19 cases is nearly double the number at any other BOP facility in the country.

"The outbreak of COVID-19 at Ft. Dix FCI is a clear and present danger to the federal employee staff, the inmates, and to our communities in New Jersey surrounding the Joint Base," Kim said in a statement.

As of Monday, BOP reported 797 active cases among inmates, and 26 active cases among staff members. No deaths have been reported.

On Tuesday, U.S. Sens. Cory Booker and Robert Menendez sent a letter to FCI Fort Dix Warden David Ortiz with raising concerns surrounding the prison's use of home confinement as well as the medical care for inmates who have tested positive for COVID-19.

As of December, 98 inmates at FCI Fort Dix have been transferred to home confinement and 89 inmates have been released through compassionate release under the CARES Act since the onset of the pandemic.

The senators called for the warden to grant home confinement to as many as eligible inmates as possible.

"The conditions at facilities in New Jersey, specifically your facility, have grown increasingly worrisome. We are still very concerned for the safety and well-being of individuals behind bars in New Jersey and across our country. It is critical that you prioritize the use of your statutory authorities to grant home confinement to as many eligible people as possible," the senators wrote.

In addition, the senators sent the warden a detailed list of questions around the BOP's home confinement program and its medical care for inmates

There are currently 2,745 inmates at the federal detention facility on Joint Base McGuire-Dix-Lakehurst.

The base is located near Burlington County towns such as Pemberton Township, Wrightstown, North Hanover, and is near the Ocean County border.

"I continue to hear from Bureau of Prisons (BOP) leadership that the situation in under control or improving, but it is clearly not," Kim said.

BOP officials declined to comment on the congressman's demand, and said responds directly to Members of Congress and their staff. Out of respect and deference to Members, we do not comment on our Congressional correspondence with media.

**Read more:** FCI Fort Dix sees 2nd COVID outbreak as active cases top 450

**Read more:** More NJ lawmakers renew call for end to inmate transfers at FCI Fort Dix

Last week, an inmate at the prison, Paul Diaz, described an environment where CDC protocols are nearly impossible to adhere to, and when they are able to be followed — like by wearing a face mask — they are often ignored.

"It's scary ... knowing our health is in their hands," Diaz, of New York City, said in a phone interview. "Don't put me in a position where I am going to get sick and get life sentence due to disease they are not controlling in a good way — especially in this environment."

The current outbreak at FCI Fort Dix is the second one to occur at the low-security correctional facility.

Cases skyrocketed at the end of October — over 300 active cases were eventually reported. Active cases among inmates were reported to be down to 16 inside the prison on Dec. 10, but the total exceeded 450 among inmates and staff by Dec. 30.

According to BOP data, 533 inmates and 45 staff members have since recovered from the virus.

Activists, inmates, their families and state legislators have pointed to the transfer of inmates from other BOP facilities, specifically FCI Elkton in Ohio, as the cause of the first outbreak.

BOP officials have denied the transfers spurred the outbreak at the low-security prison.

Kim also called for Carvajal to devote full attention to reducing spread inside the facility, extend a moratorium of inmate transfers due to expire this week and increase testing availability for staff and inmates.

Kim's demand continues the repeated calls from New Jersey legislators to the BOP director to address the ongoing outbreak at the federal prison.

*George Woolston is a South Jersey native who covers several topics for the Burlington County Times. He joined the staff in 2019. Contact him at gwoolston@thebct.com and follow on Twitter @gcwoolston. Help support local journalism with a subscription to the Burlington County Times.*

✕

**Patch.**

# Fort Dix, With Most COVID Cases Among Prisons, Sees 1st Death

**Anthony Bellano**
January 26, 2021 · 3 min read





BURLINGTON COUNTY, NJ — A federal prison in South Jersey that has been seen the highest number of coronavirus cases of any facility in the country saw its first fatality last week, officials announced.

Myron Crosby, a 58-year-old at-risk inmate at the Fort Dix Federal Correctional Institution in Burlington County, died on Friday after being hospitalized with the coronavirus, according to the Federal Bureau of Prisons (BOP).

Crosby tested positive for the virus on Dec. 28. At that point, he was immediately placed in medical isolation, authorities said. On Jan. 7, he was

medical staff on Jan. 22.

Crosby had long-term, pre-existing medical conditions, which the CDC lists as risk factors for developing a more severe version of the disease, authorities said in their announcement.

He had previously warned the jail about his health factors, and his attorney filed a motion for compassionate release last summer as the number of cases at the prison increased, according to nj.com. The motion was denied, with the judge citing the seriousness of his crimes, according to the report.

He was serving a 14-year sentence for conspiracy to distribute and possession with the intent to distribute heroin, according to the BOP release. He had been in custody since Sept. 17, 2019.

His motion was filed as the number of positive coronavirus cases at the prison continued to climb. According to the BOP, Fort Dix has had the highest number of coronavirus cases of any federal prison in the country.

More than 1,400 inmates have had the virus since the pandemic began, including 40 who are currently battling the virus. Among staff members, 72 have had the virus, including 32 who currently have it, as of Tuesday.

The numbers prompted Rep. Andy Kim, D-Burlington/Ocean, earlier this month to call on the BOP to lock the prison down.

"The outbreak of COVID-19 at Ft. Dix FCI is a clear and present danger to the federal employee staff, the inmates, and to our communities in New Jersey surrounding the Joint Base," Kim said. "I continue to hear from Bureau of Prisons leadership that the situation is under control or improving, but it is clearly not.

"I urgently call upon BOP leadership to take immediate action to stop the spread of COVID-19 at Ft. Dix FCI. There are concrete steps BOP Director Michael Carvajal can take immediately. He should order the lock down of Ft. Dix FCI, devote full attention to reducing inmate-to-inmate spread, continue the moratorium of inmate transfers in and out of the facility that is due to expire this week, increase testing availability for staff and inmates, and provide all resources available to staff in order to address the outbreak there. Not doing so would further endanger the health and safety of thousands of people and would lead to the full loss of confidence in Director Carvajal's leadership."

NEWS

# 2nd inmate at FCI Fort Dix dies from COVID-19 complications



**George Woolston**
Burlington County Times

Published 5:01 a.m. ET April 7, 2021 | Updated 10:17 a.m. ET April 7, 2021

JOINT BASE McGUIRE-DIX-LAKEHURST — A second inmate at FCI Fort Dix has died due to complications from the coronavirus, the Bureau of Prisons announced.

Fernando Marulanda Trujillo, 69, died on March 25.

Marulanda Trujillo first tested positive of COVID-19 on Dec. 12, according to the BOP. He was transported to a local hospital on the same day, and on Dec. 22, he was declared recovered after presenting no symptoms.

Marulanda Trujillo, who suffered from preexisting medical conditions that made him more vulnerable to COVID-19, was then transported to a long-term care facility, the BOP said.

His conditioned worsened on March 16, and once again he was transported to a local hospital, the BOP said. He died nine days later.

Marulanda Trujillo was serving a 210-month sentence at the low-security federal prison located on Joint Base McGuire-Dix-Lakehurst. He had been incarcerated there since 2014.

**More:** NJ lawmakers question BOP about lack of FCI Fort Dix funding

**More:** FCI Fort Dix sees first inmate death due to COVID, officials report

He is the second inmate to die from COVID-19 at the federal prison this year and the third federal inmate to die in South Jersey. Myron Crosby, 58, died on Jan. 22 due to complications from the virus. Fred Keys, 57, an inmate at FCI Fairton in Cumberland County, also died of complications from COVID-19 in January.

The BOP and the administration at FCI Fort Dix have been heavily criticized by activists and lawmakers for its handling of the virus inside the federal prison.

In March, members of New Jersey's Congressional delegation questioned why FCI Fort Dix, which has experienced multiple COVID-19 outbreaks, received none of the emergency funding allocated to help prevent the spread of COVID-19 in federal prisons.

At the end of January, there were nearly 800 active cases inside the prison.

On Feb. 1, FCI Fort Dix Warden David Ortiz was temporarily assigned to an administrative post in BOP's Northeast Regional Office Philadelphia. Lamine N'Diaye was appointed acting warden the same day.

As of April 6, 1,808 inmates and 49 staff members have recovered from the virus, according to BOP data.

There are currently 15 active cases among inmates and 41 active cases among staff.

BOP has fully vaccinated 206 inmates and 217 staff members at FCI Fort Dix, which currently houses 2,761 male inmates.

*George Woolston is a South Jersey native who covers several topics for the Burlington County Times. He joined the staff in 2019. Contact him at gwoolston@thebct.com and follow on Twitter @gcwoolston. Help support local journalism with a subscription to the Burlington County Times.*

Exhibit H

January 2, 2024

Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge Dearie,

My name is Maria Bruni and I have been in a relationship with Norman DuPont for many years - long before he was incarcerated nearly 30 years ago. I guess I would be considered his common-law wife. We had two children together, Maria and Anthony.

Norman and I have always maintained our relationship over the many years that he has been in prison - and I have never given up on him. We talk over the phone several times a week, and I have always tried to visit him whenever possible. The COVID-19 pandemic kept us apart for years with the restrictions that were put in place. It was very painful for me and my daughter not being able to see him - and for him as well. His family is all that he has after all of these years. Our son, Anthony, passed away tragically at the age of 18. And neither I nor Norman have ever fully recovered from his death ever since. So, he better understands loss now.

I have remained faithful to Norman after all of these years and I raised our children, alone. And he has always tried as best he could to be a part of our lives in return. Norman has always encouraged me to keep faith and hope alive, and to pray for those that were affected by him. I have seen his sorrow and witnessed his growth over the years and believe he is truly remorseful and a changed man. He has always shown his love to me and his children, and I know that he has prayed for forgiveness from God.

Norman is a much older man now, 74 years old, with hopefully some good years left. I pray that you give those years to our family.

Thank you.


Very sincerely,


Maria Bruni

*Maria Bruni*

January 2, 2024


Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge Dearie,


My name is Maria Dupont.  I am the youngest daughter of
Norman Dupont.  I write to Your Honor with a very heavy
heart.

My father has been incarcerated since I was 3 years old.
I am now age 33 and happily married with young 2 children.

During the height of the pandemic, lockdowns kept us from
visiting my father for a number of years. We became very
concerned about my father's health conditions, especially
when we heard that he was infected with the virus and we
never heard from him at all for very long periods of time.

My father has always tried his best to remain a presence and
be involved in my life all of these years.  It's so sad that he
has missed out on so many milestones  - but he is painfully

aware that he has no one to blame for this - but himself. I know he deeply regrets what he did and the pain it caused.

My father is near 75 years old now. He is acutely aware that one day he will have to meet his maker. I know that he has tried so hard all these years to prove to us that he is a changed man. And we are all proud of the change in him.

It would be a God-send for our family, especially my mother who has remained devoted to my father all of these years, for him to live out what time he has left with us.

Please answer our prayers.

Thank you.


Sincerely,


Maria

*Maria Dupont*

December 25, 2023

Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge Dearie:

My name is Nicole DuPont, and I am married to Ralph DuPont.
Norman DuPont is my father-in-law. I have been a part of the
DuPont family for 18 years. I first met my father-in-law in prison.
Throughout my entire marriage - and even many years before I met
him - he has been in prison.

When I first met my father-in-law, he was housed in West Virginia.
It was an 8 ½ hour drive for us to visit with him - but we've made
the trip - wherever he was and no matter how long - because it
meant so much for him to see us all. The recent COVID-19
pandemic has been absolute torture for us all, but especially for my
father-in-law, because the restrictions put in place at Fort Dix
prevented us from seeing him at all for years.

I know that my father-in-law has done everything he could to
remain a part of our lives and to keep in contact with us from behind
prison bars. My father-in-law knows that he has no one to blame

for this but himself. But, I know that he is truly sorry for what he did and that at age 74 he is a truly changed man.

My father-in-law has missed out on so many priceless milestones in his family's lives. But, he has also missed out and not been there to support his family in difficult times as well. I know how deeply he regrets and blames himself for not being there for the difficult times as well. My husband broke his neck and was paralyzed from a football accident while playing for the DSNY team about 7 years ago. Our children were only babies then and it was a very hard time for our family. Having my father-in-law with us then would have made a world of a difference. Our youngest son also deals with having Autism Spectrum Disorder and we rely heavily on our family to shower him with love, patience and to help guide him through his difficulties in life. Having his grandfather present in his everyday life would mean so much to him. My father-in-law has also suffered many losses of his own while in prison. He lost one of his children, Anthony, in a horrific accident, he also lost his mother and his sister recently passed away.

I know that my father-in-law has done all that he can to change and improve himself while in prison. He is not a young man any more and we all hope and pray that you will find it in your heart to release him to us. It would be a God-send to us all. He has been away from us for so very long.

Sincerely,

Nicole DuPont

December 26, 2023

Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 12201

Dear Judge Dearie,

I am writing to you in support of my father Norman Dupont. My father has always been a positive influence in my daily life even though he has been away from us and in prison for so very long. He was always a supportive father, and he has always remained a presence in our lives - albeit from afar.

My father has not been able to share in momentous life occasions, both good and bad, for the past twenty-nine years of my life. He has missed out on all of our greatest accomplishments; graduations, weddings, and the births of each of his seven grandchildren. He has not yet met my three and half year-old son, due to the pandemic and its restrictions. He was unable to be surrounded by our family during the hard times we faced as well. He had to mourn the losses of his mother and his sister alone. He had to grieve the tragic unexpected loss of his son at a young age without the comfort of his loved ones around him. But, he knows that he has no one to blame for his absence from our lives but himself. I know that he is ashamed of what he did - and if he could turn back the clock - he would. He is a far different and better man now.

As a grown adult, I have never been able to experience a normal relationship with my father outside of the barbed wire and confined walls of a prison setting. We can never get back the time that he has missed, but it would bring us immense joy to share all of life's occasions together as a family once again. My father is near 75 years old now and has been away from us for near 30 years. I pray daily that you can give us all another chance to be with him.

Thank you for your consideration.

Sincerely,

Norman Dupont

Norman Dupont Jr.

December 25, 2023


Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201


Dear Judge Dearie:

My name is Ralph DuPont, and I am Norman DuPont's oldest
child. I write this letter as a fully grown adult, age 47, praying
that you will order the release of my father from prison.

My father has been in prison for the majority of my life - since
my freshman year of college. He has been away from us for so
long now - nearly three decades and he is now 74 years old. I
know that he is deeply ashamed and regretful for his conduct -
and the lives that he irreparably hurt by it. But he has tried to
prove to us all ever since that he is redeemable and capable of
change and he has changed so much.

My father has missed out on countless events in my life and I
have missed having him being there to share those events. This
includes but is not limited to my college football games, my
graduation, my wedding, the births of my children and all of

their subsequent milestones. My father has done everything he can from prison to remain a large part of our lives and has always encouraged me to do well and stay on the straight and narrow in life. Because of my relationship with my father and his guidance, I have always strived to be a better man - graduating college, settling down and having a family, and having a great job with the DSNY for over 10 years.

My wife and I have 2 sons, ages 9 and 10 and we just welcomed a new baby girl. My father has barely seen my children in person, and he has not seen them at all for years, including our newborn with all the COVID restrictions. The last time we had a family visit with my father due to the COVID outbreaks where he is housed is a number of years ago. During the pandemic, we would get to speak with him, if at all, for a few minutes each month. This was obviously extraordinarily difficult for us all, but especially him - since we are his only contact with the outside world.

It would be such a blessing to us all if he is able to live out the rest of his years with us. He has already spent so much time away from us all - nearly 30 years.

Sincerely,

Ralph DuPont