UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

    :

**UNITED STATES OF AMERICA**,

    :

– against –    :  **MEMORANDUM DECISION AND ORDER**

    :

**NORMAN DUPONT**,    95-CR-91 (AMD)

    :

Defendant.    :

---------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

Before the Court is the defendant's motion to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  The 76-year-old defendant has served over 31 years of a life sentence for conspiracy to murder in aid of racketeering, murder in aid of racketeering, Hobbs Act extortion conspiracy, Hobbs Act extortion, and use of a firearm in connection with the other four charged crimes.  (ECF No. 89 at 2; ECF No. 116 at 1.)  He argues that he is entitled to relief based on "extraordinary and compelling" circumstances: (1) his extensive rehabilitation, (2) the harsh conditions of confinement during the COVID-19 pandemic, and (3) the mandatory nature of his life sentence.  (ECF No. 128.)  The government maintains that the defendant has not established extraordinary and compelling circumstances, and that reducing the defendant's sentence would undermine the goals of sentencing set forth in 18 U.S.C. § 3553(a).  (ECF No. 129.)  As explained below, the Court denies the motion.

## BACKGROUND

At the time of the defendant's 1995 trial, he had been an associate of the Gambino organized crime family of La Cosa Nostra for 13 years.  (ECF No. 89 ¶ 5.)  *United States v. Dupont*, No. 96-1172, 1996 WL 599800, at *1 (2d Cir. Oct. 18, 1996) (summary order).  For

about a decade, he was the "caretaker" of the Ravenite Social Club in New York — the "headquarters" of the Gambino family.  (ECF No. 89 ¶ 6.)  The evidence at trial established among other things that the defendant murdered Harmon Fuchs, a car service dispatcher, and extorted Mark Friedman, the owner of another car service.  (*Id.* ¶¶ 7–10.)

The trial testimony established that the defendant conspired to murder Joseph Fabozzi, another Gambino associate who owed Dupont money and had frequent disputes with other crime families.  (*Id.* ¶¶ 7–9.)  The defendant decided to kill Fabozzi or someone whose death would send a message to him.  (*Id.*; ECF No. 129 at 2.)  A Gambino captain approved the hit.  *Dupont*, 1996 WL 599800, at *1.  After the defendant and his co-conspirators abandoned one attempt to kill Fabozzi, they went to his business on February 10, 1990, planning to kill Fabozzi or any employee they encountered.  (ECF No. 116 at 2.)  Dupont walked inside and shot and killed Harmon Fuchs, a dispatcher who worked for Fabozzi's car service.  (*Id.* at 2–3.)

The defendant also conspired to extort Mark Friedman, because Friedman owed the defendant money.  *Dupont*, 1996 WL 599800, at *1.  Friedman originally owed money to a Russian organized crime group, but the Gambino Family bought the debt after Friedman sought their protection.  (ECF No. 129 at 2.)  Friedman paid back the money, but the defendant demanded that Friedman continue paying him "protection money."  (ECF No. 116 at 3.)  When Friedman defaulted on those payments, the defendant ordered his co-conspirator to assault Friedman.  (*Id.*; ECF No. 129 at 2.)  The co-conspirator did so, inflicting injuries serious enough to require hospitalization.  (ECF No. 89 ¶ 10.)

Beyond the crimes charged in the Indictment, the government also proffered that the defendant directed his co-conspirator to commit at least two other crimes.  (*Id.* ¶ 11.)  The defendant instigated a violent beating of another of his "loanshark victims," who lost several

2

teeth in the assault. (*Id.*) The defendant also instructed his co-conspirator to "torch" a car belonging to his girlfriend's son, as retribution for the son's comments about the defendant and his girlfriend. (*Id.*)

On October 10, 1995, a jury convicted the defendant of conspiracy to murder in aid of racketeering (Count One) and murder in aid of racketeering (Count Two) in violation of 18 U.S.C. § 1959; Hobbs Act extortion conspiracy (Count Three) and Hobbs Act extortion (Count Four) in violation of 18 U.S.C. § 1951; and use of a firearm in connection with the other four charged crimes in violation of 18 U.S.C. § 924(c) (Counts Five and Six). (*ECF Minute Entry dated Oct. 10, 1995*; ECF No. 116 at 1.) On March 5, 1996, former Chief Judge Raymond J. Dearie sentenced the defendant to "'a total term of life on Counts One, Two, Three and Four to run concurrently,' plus terms of five years on Count Five and 20 years on Count Six, as then required by Section 924(c), to run consecutively to each other and to the life sentences." (ECF No. 116 at 2 (quoting ECF No. 75).) [1, 2]

The Court assumes familiarity with the procedural history of the defendant's case since his sentencing. The defendant appealed his conviction. *See Dupont*, 1996 WL 599800. He moved to vacate his sentence pursuant to 28 U.S.C. § 2255. *See Dupont v. United States*, No. 97-CV-6035 (E.D.N.Y. Oct. 20, 1997), ECF No. 32, *aff'd*, 224 F. App'x 80 (2d Cir. 2007). (*See also* ECF No. 116.) He also filed petitions for compassionate release. (*See* ECF Nos. 100, 110, 124). On May 3, 2021, Judge Dearie vacated the defendant's conviction under Count Six and issued an amended judgment reducing his sentence to life plus five years. (ECF No. 116; ECF

---

[1] After Judge Dearie retired in late 2022, this case was reassigned to Judge Rachel P. Kovner on January 8, 2024 (*ECF Order dated Jan. 8, 2024*), and then to this Court on March 13, 2026, (*ECF Order dated Mar. 13, 2026*).

[2] The transcript of the defendant's sentencing is no longer available.

No. 118 at 4.)  Judge Dearie denied the other applications, and the Second Circuit affirmed any appeals.  *See Dupont*, 1996 WL 599800; *Dupont v. United States*, No. 97-CV-6035 (E.D.N.Y. Oct. 20, 1997), ECF No. 32; *aff'd*, 224 F. App'x 80 (2d Cir. 2007).  (*See* ECF Nos. 100, 110, 124.)

## LEGAL STANDARD

Under 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018), a criminal defendant can move for "modification" of an imposed term of imprisonment.  To qualify for this relief, the defendant must show that (1) he "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[;]" (2) that "extraordinary and compelling reasons" warrant a reduction; (3) that these reasons outweigh the Section 3553(a) factors; and (4) that "a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A); *see also United States v. Thrower*, 495 F. Supp. 3d 132, 136–37 (E.D.N.Y. 2020).

The defendant must prove that "extraordinary and compelling reasons" justify reducing his sentence.  *United States v. Andrews*, 705 F. Supp. 3d 142, 147 (S.D.N.Y. 2023); *United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."). In making its determination, the district court may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release."  *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020); *United States v. Fernandez*, 104 F.4th 420, 426–427 (2d Cir. 2024) (discussing the legal standard for

motions to reduce a term of imprisonment).  "[A]n extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment."  U.S.S.G. § 1B1.13(e).  Rather, "[t]he only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason.'"  *Brooker*, 976 F.3d at 237–38 (quoting 28 U.S.C. § 994(t)).

**DISCUSSION**

## I.      Extraordinary and Compelling Circumstances

The defendant argues that there are three extraordinary and compelling circumstances that warrant reducing his sentence: (1) his extensive rehabilitation, (2) the harsh conditions of confinement during the COVID-19 pandemic, and (3) the mandatory nature of his life sentence. (ECF No. 128.)  The government opposes.  (ECF No. 129 at 6–7.)  The Court concludes that none of these circumstances, either individually or in combination, rise to the level of extraordinary and compelling circumstances.

### a.      Rehabilitation

The defendant cites evidence of his efforts at rehabilitation, including a June 21, 2022 positive decision report from the Bureau of Prisons ("BOP") (ECF No. 128 at 39), an April 27, 2023 summary reentry plan and progress report (*id.* at 41–46), a January 5, 2023 recidivism risk assessment (*id.* at 49), positive letters from five BOP officers (*id.* at 47; ECF No. 131 at 17–20), and letters of support from his family, (ECF No. 128 at 63–72).  One of the officers who supervises the defendant in his job as a housing unit orderly submitted a recommendation that reads in relevant part:

> Inmate Norman Dupont works well with others.  He has helped and guided new inmates with adapting, coping, and becoming acclimated with the prison environment.  He deters negative

5

> behavior. He follows the rules, policies, and guidelines without deviating. He has been a model inmate to the inmate community. Inmate Norman Dupont is respectful and compliant to staff. His behavior emulates a man who aims to be law abiding citizen and desires to return back to society. Inmate Norman Dupont has been incident report free for over 25 years. A noteworthy accomplishment.

(ECF No. 128 at 47.)  Other BOP personnel made similar observations.  The defendant's unit team prepared a reentry plan that includes the following:

> Unit Team has had the opportunity to see the impact inmate Dupont has made on some of the inmates he interacts with. Due to him having a Life Sentence, many inmates as well as staff are amazed at how he has a positive attitude and enjoys life everyday. Unit Team feels if he is given the opportunity to release, he will be a productive citizen and will live the rest of his life as a model citizen.

(*Id.* at 44.)  The defendant's family also wrote letters and say that the defendant "deeply regrets what he did and the pain it caused" (*id.* at 66), and that he "better understands loss" after the death of his 18-year-old son, (*id.* at 63).  The government "does not dispute the defendant's positive record" at Federal Correctional Institution, Fort Dix ("FCI Fort Dix") but argues that it does not warrant a sentence reduction.  (ECF No. 129 at 6.)

The Court commends the defendant for his efforts to rehabilitate himself — efforts that BOP personnel, who have no personal stake in his request for release, also commend.  *Cf. United States v. Mitchell*, No. 96-CR-126, 2021 WL 1400053, at *3 (S.D.N.Y. Apr. 14, 2021) ("Mitchell's argument on this point relies entirely on his self-proclamation that he is sufficiently rehabilitated — Mitchell does not include any letters from individuals without a personal stake in his request for release, such as BOP officials or Mitchell's fellow inmates.").  But rehabilitation alone cannot justify a reduced sentence.  *Brooker*, 976 F.3d at 237–38; *United States v. Polanco*, No. 08-CR-65, 2022 WL 17623942, at *1 (E.D.N.Y. Dec. 13, 2022) ("While the Court recognizes [the defendant's] rehabilitative efforts, the Second Circuit has made abundantly clear

that rehabilitation alone cannot justify compassionate release." (citing *Brooker*, 976 F.3d at 237–38)); *United States v. Pappa*, No. 97-CR-1005, 2025 WL 1548762, at *11 (E.D.N.Y. May 30, 2025) ("[E]ven extraordinary rehabilitation is insufficient to justify a reduced sentence under Section 3582(c)(1)(A)(i)." (citing *Brooker*, 976 F.3d at 237–38)).

      **b.**       **Conditions of Confinement During COVID-19**

The defendant also cites conditions during the COVID-19 pandemic, including lockdowns and harsh restrictions, which kept the defendant from seeing his family for years, making his incarceration "far harsher and more punitive than normal." (ECF No. 128 at 10–11.) The government responds that the pandemic-related conditions of confinement do not justify compassionate release. (ECF No. 129 at 6–7 (citing *United States v. Ramirez*, 571 F. Supp. 3d 40, 47 (S.D.N.Y. 2021).)

As other courts have observed, the pandemic "'made incarceration harsher and more punitive than would otherwise have been the case,'" because prisoners endured "extended lockdowns, constant fear of contracting a deadly virus, limited communication with family, and reduced access to programming," among other things. *United States v. Parish*, No. 13-CR-829, 2024 WL 3904626, at *6 (S.D.N.Y. Aug. 22, 2024) (quoting *United States v. Tellier*, No. 92-CR-869, 2022 WL 1468381, at *4 (S.D.N.Y. May 10, 2022)); *see also United States v. Rengifo*, F. 569 F. Supp. 3d 180, 196–97 (S.D.N.Y. 2021). But the Court is "unpersuaded that the difficult — but generalized — prison conditions during the COVID-19 pandemic by themselves qualify as an extraordinary and compelling reason for the release of inmates incarcerated during the pandemic." *United States v. Boynton*, No. 20-CR-43, 2022 WL 7131927, at *1 (E.D.N.Y. Oct. 12, 2022) (citation modified) (collecting cases); *United States v. Jackson*, No. 10-CR-227, 2025 WL 1029866, at *3 (D. Conn. Apr. 7, 2025) ("Although not of itself a basis upon which to grant

compassionate release, courts are generally in agreement that incarceration during the pandemic made for harsher conditions than were anticipated at the time of sentencing.").

### c.    Life Sentence

Finally, the defendant argues that compassionate release is warranted because his sentence is unusually long.  (ECF No. 128 at 12–13.)  An "unusually long" sentence may weigh in favor of a sentence reduction.  *See Brooker*, 976 F.3d at 238.  Moreover, "a mandatory minimum sentence does not preclude a district court from reducing a term of imprisonment on a motion for compassionate release."  *United States v. Halvon*, 26 F.4th 566, 570 (2d Cir. 2022).

The defendant argues first that "the mandatory minimum life sentence may have been imposed in error."  (ECF No. 128 at 12.)  Second, he cites the differences in the sentencing regimes at the time he was sentenced and now.  (*Id.* at 12–13.)  Judge Dearie sentenced the defendant when the Sentencing Guidelines were mandatory and mandated a guidelines range of life; now, the defendant says, a sentencing court could impose a term less than life, because the sentencing guidelines are advisory.  (*Id.* (citing *United States v. Booker*, 543 U.S. 220, 245 (2005).)    Third, the defendant asserts that a life sentence is above the 21.5-year average sentence imposed for murder in federal courts and the 19-year average sentence imposed for murder in the Second Circuit.  (*Id.* at 12–14, 18.)  None of these arguments are persuasive.

On May 3, 2021, Judge Dearie vacated the defendant's conviction on Count Five.  In that order, which he issued more than 20 years after he sentenced the defendant, he wrote that the "Count Two murder conviction" "carr[ied] a mandatory life sentence" under 18 U.S.C. § 1959(a)(1).  (ECF No. 116 at 1–2.)  However, as the government notes, the defendant "murdered Fuchs before 18 U.S.C. § 1959 was amended to mandate a life sentence or death, but was sentenced for the murder after that amendment went into effect."  (ECF No. 129 at 7 n.2.)

The *Ex Post Facto* Clause of the Constitution, U.S. Const. art. I, § 9, cl. 3, prohibits "the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred." *Weaver v. Graham*, 450 U.S. 24, 30 (1981). Accordingly, the amendment to Section 1959 did not apply to the defendant, and a life sentence was not mandatory under that statute.

Nevertheless, a life sentence was mandatory under the pre-*Booker* Sentencing Guidelines. (ECF No. 128 at 12; ECF No. 129 at 7.) U.S.S.G. §§ 2A1.1, 2E1.3, 4B1.1 (1995). The Sentencing Guidelines are no longer mandatory, but "*Booker* is not retroactive." *Guzman v. United States*, 404 F.3d 139, 141 (2d Cir. 2005). Moreover, Judge Dearie has made it clear that he would have imposed a life sentence regardless of the Guidelines. (*See* ECF No. 110 ("[U]pon consideration of the factors in 18 U.S.C. § 3553, I do not consider the matter a close question. The brutal and senseless killing in this case warrants the punishment imposed. . . .").) Therefore, the defendant is not entitled to compassionate release based on the mandatory nature of his sentence. *See United States v. Tran*, No. 90-CR-1019, 2022 WL 7132195, at *4 (E.D.N.Y. Oct 12, 2022) ("I cannot conclude that the fact that a defendant was sentenced under the mandatory Guidelines is by itself an extraordinary and compelling reason to reduce his sentence now.").

Finally, the defendant argues that release is warranted because he has been in prison for longer than the average sentence imposed for murder. (ECF No. 128 at 13.) According to the defendant, "the average federal sentence imposed last year nationwide for the crime of murder was 21.5 years, and in the Second Circuit, the average was less than 19 years." (*Id.*) Even if these statistics are accurate, this is not an exceptional circumstance. "Life imprisonment remains the sentence described by the Sentencing Guidelines for murder and life sentences are still imposed for murder in a not insignificant number of cases." *United States v. Frias*, No. 01-CR-

307, 2023 WL 2713631, at *1 (S.D.N.Y. Mar. 30, 2023); *see also United States v. Stewart*, No. 02-CR-1435, 2025 WL 89298, at *7 (S.D.N.Y. Jan. 14, 2025) (denying compassionate release and finding life sentence appropriate for man convicted of murder). Furthermore, a defendant who committed the same offenses today would be subject to a mandatory minimum sentence of life under 18 U.S.C. § 1959(a)(1).

## II.    3553(a) Factors

As explained above, the defendant has not established extraordinary and compelling circumstances. But even if he had, the Section 3553(a) factors weigh against release. *See United States v. Ebbers*, 432 F. Supp. 3d 421, 430–31 (S.D.N.Y. 2020) (The court should "assess whether [the Section 3553(a)] factors outweigh the 'extraordinary and compelling reasons' warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence."). The defendant was a long-time member of the Gambino crime family and committed crimes on behalf of that organization. He had one man beaten over money and executed an innocent car-service dispatcher for no other reason than to "send a message." *Dupont*, 1996 WL 599800, at *1. A life sentence was just punishment for these crimes. Releasing the defendant now would "disserve the interests embodied in the Court's original sentencing determination — most significantly, the need for the sentence imposed to reflect the need for just punishment." *United States v. Harris*, No. 15-CR-445-11, 2020 WL 5801051, at *4 (S.D.N.Y. Sept. 29, 2020); *see also Frias*, 2023 WL 2713631, at *1 (concluding that the Section 3553(a) factors did not support compassionate release because the defendant "was intimately involved in this ruthless murder").

**CONCLUSION**

For the reasons set forth above, the Court denies the defendant's motion for reduction of his sentence pursuant to 18 U.S.C § 3582(c)(1)(A)(i).

**SO ORDERED.**

      s/Ann M. Donnelly      
ANN M. DONNELLY  
United States District Judge

Dated: Brooklyn, New York  
      June 2, 2026